**ON REHEARING EN BANC**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FREDERICK P. HENRY,

*Plaintiff-Appellant,*

v.

ROBERT PURNELL,

*Defendant-Appellee.*

No. 08-7433

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:04-cv-00979-JFM)

Argued: March 24, 2011

Decided: July 14, 2011

Before TRAXLER, Chief Judge, and WILKINSON,
NIEMEYER, KING, GREGORY, SHEDD, DUNCAN,
AGEE, DAVIS, KEENAN, WYNN, and DIAZ,
Circuit Judges.[1]

Reversed and remanded by published opinion. Judge Gregory
wrote the opinion, in which Chief Judge Traxler and Judges
Wilkinson, King, Duncan, Davis, Keenan, Wynn, and Diaz
joined. Judge Davis wrote a concurring opinion. Judge Shedd

[1]Judge Motz did not hear oral argument or participate in the decision of
this case.

wrote a dissenting opinion, in which Judges Niemeyer and Agee joined. Judge Niemeyer wrote a separate dissenting opinion.

---

**COUNSEL**

**ARGUED:** Katherine Louise Bushman, GEORGETOWN UNIVERSITY LAW CENTER, Appellate Litigation Program, Washington, D.C., for Appellant. John Francis Breads, Jr., Hanover, Maryland, for Appellee. **ON BRIEF:** Steven H. Goldblatt, Director, Charlotte J. Garden, Supervising Attorney, May K. Chiang, Student Counsel, Kate G. Henningsen, Student Counsel, GEORGETOWN UNIVERSITY LAW CENTER, Appellate Litigation Program, Washington, D.C., for Appellant.

---

**OPINION**

GREGORY, Circuit Judge:

Without warning, Officer Robert Purnell shot Frederick Henry, an unarmed man wanted for misdemeanor failure to pay child support, when he started running away. In the ensuing § 1983 action, the parties stipulated that Purnell had intended to use his Taser rather than his gun and the district court granted him summary judgment. However, because *Tennessee v. Garner* prohibits shooting suspects who pose no significant threat of death or serious physical threat, and because Purnell's use of force could be viewed by a jury as objectively unreasonable, we reverse and remand.

I.

Since this case stems from the grant of summary judgment for Purnell, we recount the facts in the light most favorable to

the non-movant, Henry. *See George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 392 (4th Cir. 2009).

In 2003, a Maryland state court ordered Henry to either pay child support or report to jail on September 8, 2003. When Henry did not comply, a warrant was issued for his arrest on October 9, 2003 for second degree escape. Maryland law defines second degree escape as "knowingly fail[ing] to obey a court order to report to a place of confinement." Md. Code Ann., Crim. Law, § 9-405(a)(2). "A person who violates this section is guilty of the misdemeanor of escape in the second degree . . . ." *Id.* § 9-405(b) (currently codified at § 9-405(c)).

Eleven days later, on October 20, 2003, Purnell first attempted to serve the warrant at Henry's last known address, a trailer home in Eden, Maryland. Purnell approached a man who was sitting on the front steps of the trailer and who identified himself as Henry's friend. The man said Henry worked at American Paving Company and offered to give Purnell's name and number to Henry's wife, who was inside the trailer. Purnell then went to the American Paving Company, where an employee said that Henry had not worked in three months, and showed Purnell a photo of Henry. The photo appeared to match the man who had identified himself as Henry's friend. Purnell returned to the trailer home later that day and spoke with Henry's wife. She told Purnell that Henry was not home, allowed Purnell to enter the trailer, and said that Henry worked for a man in a white pickup truck. Purnell seemed "very upset" and told her that he was going to "get [Henry] for pulling a whammy" on him. J.A. 534-35. The next day, October 21, 2003, Henry's wife called Purnell to add that she had given Henry the message and that he was traveling to Baltimore to try to raise bail money.

On October 23, 2003, while in the vicinity for other reasons, Purnell passed by a white pickup truck. Purnell followed the truck and found it parked in the driveway of the trailer home he had previously visited. Purnell approached the truck,

which contained a driver, Thomas Walston, and two passengers, Gene Moore and Henry. Purnell came to the driver's side window and asked each man if he was Henry. Each initially said no, but when Purnell asked again, Henry admitted his identity. Henry then exited the vehicle and proceeded to the back of the truck with Purnell. Henry then "started to run towards the front of his truck which was in the direction of the trailer where [he] lived." J.A. 537-58. Eyewitness Walston described Henry as "kind of jogging a little bit." J.A. 13-14. "Within a second," Purnell started running after him; Purnell was roughly five to ten feet away. J.A. 257, 538.[2]

Purnell had holstered two weapons on his right leg: on his hip was a service revolver, a Glock .40 caliber handgun. On his thigh was an electroshock weapon, a Taser M26 (hereafter, the "Taser"). The Taser was "just underneath [the] service pistol," approximately twelve inches apart. J.A. 139, 200. Purnell un-holstered his Glock and held it in the horizontal firing position for "[t]hree to five seconds." J.A. 269, 271. He did not issue any verbal warning messages, commands, or instructions to halt. Purnell then fired a single shot, striking Henry in the elbow. Walston, an eyewitness, said Purnell "shot [Henry] before he got past the far end of the trailer." J.A. 13-14. Purnell caught up with Henry, who was lying on the ground, repeating "[h]e shot me, [h]e shot me," and talking about how much it hurt. J.A. 13. Purnell said he "never intended to shoot Mr. Henry, that [he] had grabbed the wrong weapon." J.A. 139. Purnell called an ambulance and retrieved medical supplies to slow Henry's bleeding.

---

[2]Henry claimed that he never had any physical contact with Purnell. In his affidavit, Purnell stated that "although I had stumbled backward when Mr. Henry pushed away, I recovered and reached for my Taser." J.A. 139. In his deposition, Purnell said that Henry "pushed away" with "both arms," and that Purnell "fell backwards and caught himself" on his "car and [ ] right leg." J.A. 256.

## II.

This case has a long procedural history: In March 2004, Henry brought this § 1983 action alleging Purnell violated his Fourth Amendment right to be free from seizures effectuated by excessive force.

In May 2004, Purnell motioned for the district court to dismiss the case or grant summary judgment in his favor. Purnell contended that he had not "seized" Henry and, alternatively, that he was entitled to qualified immunity. The district court denied Purnell's motion because his "assertions [that he drew the wrong weapon] necessarily depend upon his credibility and therefore give rise to a genuine dispute of material fact." J.A. 16.

In June 2004, Purnell filed an interlocutory appeal, claiming that the record did not support the district court's conclusion that he was not entitled to qualified immunity. We dismissed the appeal for lack of jurisdiction because "Purnell's argument . . . challenges the district court's factual finding." *Henry v. Purnell*, 119 Fed. Appx. 441, 443 (4th Cir. 2005) (unpublished) (per curiam) (hereafter, "*Purnell I*").

In June 2005, Henry moved for leave to file an amended complaint, which the district court granted. Henry added a claim for excessive force based on the Maryland Constitution's Declaration of Rights.

On November 10, 2005, the parties entered into a stipulation "for the purposes of this litigation, that on October 22, 2003, [Purnell] intended to un-holster and discharge his Taser M26 which was mounted in a thigh holster below his service weapon, a Glock .40 caliber handgun. Instead, he un-holstered and fired his service weapon, believing that it was his Taser M26." J.A. 30.

In November 2005, Purnell filed a second motion for summary judgment, arguing that the Fourth Amendment was

inapplicable because he never intended to seize Henry with a gun. Alternatively, Purnell argued he was entitled to qualified immunity and was also immune from state tort liability. Henry opposed summary judgment on the grounds that the shooting was a seizure, that outstanding issues of material fact had to be resolved by a jury, and that Purnell was not entitled to qualified immunity. Henry stressed several factors which made Purnell's conduct unreasonable, such as his failure to give a warning or command before firing. Henry also pointed out Purnell's failure to notice physical differences between the Taser and Glock, including the Taser's safety switch, weight, color, and holster position. The parties also disputed the production of additional evidence about Taser training.

In April 2006, the district court issued its first opinion, denying Purnell's motion for summary judgment and granting Henry's motion to compel new evidence about Taser training materials. *Henry v. Purnell*, 428 F. Supp. 2d 393, 395-98 (D. Md. 2006). It found "the evidence on summary judgment [was] fully sufficient to create a jury issue on the question of whether Purnell was grossly negligent." *Id*. The district court also proposed "a 'heightened culpability element' should be added to a Fourth Amendment civil claim." *Id.* at 399. The court acknowledged that this was "arguably inconsistent with current law," "difficult to reconcile with a strict reading of" the objective reasonableness test set out in *Graham v. Connor*, 490 U.S. 386 (1989), and partially "inconsistent with the literal language of *Graham*." *Henry*, 428 F. Supp. 2d at 399-400, 401 n.9.[3]

---

[3]Instead, the court advocated a narrow reading of *Graham*, reasoning that it was "not entirely clear, that [objective reasonableness] was the [Supreme] Court's intended meaning (or that it would have been the Court's intended meaning had it foreseen the confused manner in which the law subsequently developed)." *Henry*, 428 F. Supp. 2d at 401. Under any reading of *Graham*, the district court concluded that "the time has come for appellate courts to revisit the issue of whether an element of culpability greater than negligence should explicitly be made a component of a Fourth Amendment civil claim." *Id.* at 402.

Purnell appealed to this Court again, claiming that the district court erred in concluding that he "seized" Henry and denying him qualified immunity. J.A. 7-8. In September 2007, we affirmed in part and vacated in part. *Henry v. Purnell*, 501 F.3d 374 (4th Cir. 2007) (hereafter, "*Purnell II*").[4] We affirmed the district court's determination that Purnell's shooting of Henry was a "seizure" under the Fourth Amendment. *Id.* at 381-82. But we vacated and remanded the case for the district court to "reassess the issue of whether a constitutional violation occurred in light of the proper burden of proof and the discovery materials that it ordered Purnell to produce." *Id.* at 384. If on remand Henry "establish[ed] that the seizure in this case was unreasonable (*i.e.*, that Purnell's mistake in using the Glock rather than the Taser was unreasonable)," then we suggested that Purnell would "have the opportunity to demonstrate his entitlement to qualified immunity." *Id.* at 384.

On remand, Henry received the additional discovery he had requested about Purnell's weapons training and the sheriff's use of force policy. These included more than two hundred pages of training materials and depositions.[5] *See generally,*

---

[4]The opinion was filed by two judges, a quorum of the panel under 28 U.S.C. § 46(d), because a third judge heard oral argument but did not participate in the decision. 501 F.3d at 376 n.1.

[5]On August 21, 2003, Purnell took a three-and-a-half hour Taser training class with six or seven other individuals and was certified in Taser use. That training included a PowerPoint presentation with 150 slides, which discussed the "Pro's & Con's" of different holster configurations. J.A. 297-447. The training explicitly discussed the dangers of carrying a gun and Taser on the same leg, known as a "dominant side carry." J.A. 332. The training warned that this creates a "Higher Risk of Confusion Depending on Training." J.A. 332. The presentation also detailed "3 incidents of accidental shootings by mistaken weapon," in California and Minnesota. J.A. 332. As a result of these accidents, one of which was fatal, the training warned that "[a]ll three agencies have since switched to a support side carry and have yellow M26s." J.A. 332. The closing statement of the training read as follows: "The most important decision an officer can make is whether or not to engage deadly force upon a person." J.A. 450. The class also included a hands-on component where Purnell shot a Taser into a target.

J.A. 285-514, 539-542, 549. Discovery also revealed several physical differences between the Glock and Taser.[6]

In March 2008, Purnell filed his third motion for summary judgment, stressing that he had "no field training with, or field use of, the Taser prior to the occurrence." J.A. at 115. Purnell also emphasized that the Taser's manufacturer had warned about holstering two weapons on the same leg, but that warning was "never imparted to [Purnell] or anyone else." J.A. 115. In opposing the motion Henry argued that material facts remained in dispute and that Purnell's mistake was unreasonable because he did not "comply with multiple police department regulations," which resulted in a "reckless failure to take steps to avoid the impermissible use of excessive force." J.A. at 520-21. Henry stressed that "[i]t has been clearly established . . . [that] reckless conduct on the part of a police officer that directly leads to an accidental or unintentional shooting violates the suspect's Fourth Amendment rights." J.A. 526 (citing *Jenkins v. Averett*, 424 F.2d 1228, 1232 (4th Cir. 1970)). Henry also maintained his state law claim.

In June 2008, the district court issued its second opinion, granting Purnell's motion for summary judgment. *Henry v. Purnell*, 559 F. Supp. 2d 648 (D. Md. 2008). The court stressed that "the dispositive question is whether, under the circumstances and filtered through the lens of the officer's perception, it was reasonable for Purnell to believe that the weapon he upholstered and fired was the Taser." *Id.* at 651-52 (quotations and citations omitted). The court concluded that Purnell's belief was reasonable because his training was

---

[6]A Taser M26 weighed 19.2 ounces, was 8.30 inches long (with a cartridge), 6.00 inches tall, and 1.75 inches wide. The Taser had yellow coloring on both sides and the back of the weapon and contained a laser sight and a battery light. A Glock .45 (similar to Purnell's .40 caliber) weighed 38 ounces (with a magazine), was 7.59 inches long, 5.47 inches tall, and 1.27 inches wide. The Glock was colored black and had no laser sight or lights. The holster straps of the two weapons were made of different materials.

"quite minimal" and there was apparently "no discussion about the possibility of erroneous weapon usage." *Id.* at 652.[7]

In September 2010, a divided panel of this court affirmed the district court decision. *Henry v. Purnell*, 619 F.3d 323 (4th Cir. 2010); *see also id.* at 343 (Gregory, J., dissenting). Henry moved for rehearing and rehearing *en banc*. We granted rehearing *en banc* and now, reverse and remand for trial.

### III.

Henry first maintains that the district court erred in granting summary judgment to Purnell on Henry's § 1983 claim. We agree.

Whether a party is entitled to summary judgment is a question of law we review de novo using the same standard applied by the district court. *Canal Ins. Co. v. Distrib. Servs., Inc.*, 320 F.3d 488, 491 (4th Cir. 2003). Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, "no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003).

Purnell contends that he was rightly granted summary judgment on the basis of qualified immunity because the parties stipulated that he mistakenly used his firearm instead of his Taser. Henry argues that we should disregard Purnell's subjective intent (to draw his Taser) and that Purnell's conduct was objectively unreasonable.

---

[7]The district court also mused that "[p]erhaps . . . Purnell's employer[ ] and/or the Taser manufacturer were negligent in not providing greater training," but they "are not defendants in this action . . . ." 559 F. Supp. 2d at 652. The court disregarded the fact that Purnell "may not have complied with the [Sheriff's] Taser policy" and did not notice various physical differences between his weapons. *Id.* at 652 n.3.

Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful. *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *overruled in part*, *Pearson v. Callahan*, 129 S. Ct. 808 (2009); *see also Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011). "Following the Supreme Court's recent decision in *Pearson*[ ], we exercise our discretion to use the two-step procedure of *Saucier*[ ], that asks first whether a constitutional violation occurred and second whether the right violated was clearly established." *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010) (citations omitted). "If [an officer] did not violate any right, he is hardly in need of any immunity and the analysis ends right then and there." *Abney v. Coe*, 493 F.3d 412, 415 (4th Cir. 2007).

The Fourth Amendment's prohibition on unreasonable seizures includes the right to be free of "seizures effectuated by excessive force." *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006). Whether an officer has used excessive force is analyzed under a standard of objective reasonableness. *Scott v. Harris*, 550 U.S. 372, 381 (2007); *see also Kentucky v. King*, 131 S. Ct. 1849, 1859 (2011) ("Our [Fourth Amendment] cases have repeatedly rejected a subjective approach, asking only whether the circumstances, viewed objectively, justify the action.") (internal quotation marks and citations omitted). Thus, courts determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). In considering whether an officer used reasonable force, a court must focus on the moment that the force is employed. *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996). At the summary judgment stage, once we have viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer's actions were reasonable is a question of pure law. *Scott*, 550 U.S. at 381 n.8. It is in light of these legal principles that we address whether

the evidence, viewed in the light most favorable to Henry, shows that Purnell used objectively unreasonable force.

### A.

A police officer who shoots a fleeing suspect without "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others" violates that suspect's Fourth Amendment rights. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* at 11.[8]

The objective circumstances of this case are that Purnell shot a fleeing suspected misdemeanant whom he had no reason to believe was a threat. Henry had an eleven-day old warrant issued for a misdemeanor — failure to pay child support. Nothing in the record suggested Henry had any history of violence. That Henry had previously hidden his identity does not imply he was prone to aggression. Purnell had already been inside Henry's home. Henry's home address, wife's identity, former employer, and employer's car were all known. The officer also knew that Henry had left town to raise bail money and thereafter planned to return to pay for bail. When police approached Henry's car, he voluntarily identified himself and exited the car. He then began running away.

Thus, critically, this case presents nothing to suggest Henry posed any threat whatsoever — no menacing conduct and no violent criminal history. To the contrary — police had signifi-

---

[8]In *Graham v. Connor*, the Supreme Court extended *Garner* and held "that all claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard, rather than a 'substantive due process' approach." 490 U.S. 386, 395 (1989). *See also Abney*, 493 F.3d at 415 (citing *Graham*).

cant information about Henry's likely whereabouts, motives, associations, and appearance. In sum, a reasonable officer in these circumstances would have had no grounds for believing Henry was armed or dangerous.[9] The parties do not seriously dispute as much.

The parties have stipulated, however, that the shooting here was based on a mistake of fact insofar as Purnell believed he was firing his Taser rather than his Glock. Based on this stipulation, Purnell attempts to defend the constitutionality of his actions by maintaining that he simply made an "honest mistake." Appellee's Br. 22 (internal quotation marks omitted). But it is not the honesty of Purnell's intentions that determines the constitutionality of his conduct; rather it is the objective reasonableness of his actions. It is certainly true that mistaken, but reasonable, decisions do not transgress constitutional bounds. *See, e.g.*, *McLenagan v. Karnes*, 27 F.3d 1002 (4th Cir. 1994). All actions, however, mistaken or otherwise, are subject to an objective test.

There were several facts that Purnell knew or should have known that would have alerted any reasonable officer to the fact that he was holding his Glock. First, and most basically, Purnell knew he carried his Taser in the holster on his right thigh, which was about a foot lower than the holster on his hip that held his Glock. *See Sevigny v. Dicksey*, 846 F.2d 953, 957 n.5 (4th Cir. 1988) ("Objective inquiry into the reasonableness of an officer's perception of the critical facts leading to

---

[9]Purnell stated in his deposition that he was concerned that because Henry was in his neighborhood, he could have run somewhere and picked up a weapon. However, that possibility did not make Henry an immediate threat. Purnell also testified that he did not know whether Henry was armed since he had not searched him. But Purnell had no reason to believe, or even suspect, that Henry was armed. When the dissent stresses Purnell's personal hypotheses about what Henry might have done, dissenting op. at 33-34, it slips into the subjective and implies that all fleeing suspects may be apprehended through the use of deadly force. *Garner* and *Graham* hold otherwise.

an arrest . . . must charge him with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances. Indeed his subjective beliefs about the matter, however induced, are actually irrelevant to the inquiry.") (internal quotation marks omitted). Second, Purnell could feel the weight of the weapon he held in his hand, which, at about 38 ounces, was nearly twice the weight of his Taser. Third, Purnell knew the Taser had a thumb safety that had to be flipped to arm the weapon. The Glock he was holding had no thumb safety.[10] This was not a situation in which the facts known to the officer led to multiple reasonable inferences.

It bears emphasis that this also was not a situation in which circumstances deprived Purnell of the opportunity to fully consider which weapon he had drawn before firing.[11] *See Graham*, 490 U.S. at 397 (explaining that courts must make "allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving"). As he pursued Henry in an attempt to arrest him for a fairly minor, non-violent crime, Henry had his back to Purnell and was not threatening him or anyone else in any way. There was no evidence indicating that Purnell did not have the split-second he would

---

[10]Purnell claims that the firearm he previously carried, fourteen months before the day of the shooting, had a thumb safety. He claims that on the occasions when he trained with his Glock he noticed that he still made the same instinctive thumb motion that he used to make with his prior weapon. For that reason, he maintains that it was reasonable for him not to notice the lack of a thumb safety on his Glock. However, regardless of whether he continued to instinctually attempt to flip his thumb safety on his Glock, a reasonable officer would have noticed that he was not pushing anything with his thumb when he made that motion.

[11]Purnell admitted in his deposition that while he was never "told directly" during his Taser training, nonetheless "[i]t was implied" and "understood" that he should make sure he had drawn his Taser rather than his firearm before firing. J.A. 512.

have needed to at least glance at the weapon he was holding to verify that it was indeed his Taser and not his Glock.[12]

For all of the reasons set out above, when the record is viewed in the light most favorable to Henry, Henry can show Purnell's actions were not objectively reasonable.[13] Thus, the evidence forecasted in the record by Henry is sufficient to show that Purnell violated Henry's Fourth Amendment rights.[14]

---

[12]As we have noted, the Glock was completely black, while the Taser had yellow coloring on both sides. Also, the barrel of the Glock resembles a traditional handgun barrel, cylindrical and narrow, while the Taser's "barrel" is box-shaped.

[13]It bears recognizing that at trial, of course, the jury will not be required to view the evidence in the light most favorable to Henry.

[14]The dissent avoids qualified immunity altogether by reasoning that "the Fourth Amendment does not address the accidental effects of otherwise lawful government conduct . . . ." Dissenting op. at 41. That conclusion paraphrases *Brower v. County of Inyo*, but miscomprehends its legal import. 489 U.S. 593, 596 (1989) (discussing "the accidental effects of otherwise lawful government conduct."). *Brower* held that a police roadblock which accidentally killed a fleeing suspect constituted a seizure. *Id.* at 599. *Brower*'s discussion of police intent, *id.* at 596-597, stands for nothing more than the unremarkable proposition that intent can be a precondition for whether a Fourth Amendment seizure occurred in the first place, *infra* n.15. *Brower* could have chosen to exempt all accidents from the Fourth Amendment. But instead, the Court remanded the case to consider if the roadblock was unreasonable and preserved the objective standard: "It may well be that [police] here preferred, and indeed earnestly hoped, that Brower would stop on his own, without striking the [roadblock], but we do not think it practicable to conduct such an inquiry into subjective intent." 489 U.S. at 598.

Moreover, the dissent itself concedes that "[n]one of the[ ] cases [it cites] involves the precise factual situation present here. . . ." Dissenting op. at 40. For example, *Milstead v. Kibler* involved a bloody gun and knife fight where two men were wrestling and police shot the wrong one. 243 F.3d 157, 165 (4th Cir. 2001). That reasonable reaction to a deadly threat is already constitutional under *Garner*, but it differs markedly from the situation before us here.

## B.

Having concluded based on the facts we must accept at the summary judgment stage that Purnell's use of force would have been unreasonable, we now turn to the second prong in the qualified immunity analysis, which requires this Court to decide "whether the [constitutional] violation was of a 'clearly established' right." *Valladares v. Cordero*, 552 F.3d 384, 388 (4th Cir. 2009). The second prong is "a test that focuses on the objective legal reasonableness of an official's acts." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). An official will not be held liable unless "[t]he contours of the right [he is alleged to have violated were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

Here, Henry can show under prong one of the qualified immunity analysis that a reasonable officer would have realized he was holding a firearm when shooting. Under prong two, it would have been clear to a reasonable officer that shooting a fleeing, nonthreatening misdemeanant with a firearm was unlawful. This basic legal principle had been established by the Supreme Court years earlier in *Garner*.

Purnell nevertheless argues that he is entitled to qualified immunity because it was not clearly established at the time of the shooting that it would be unconstitutional for an officer to fire his weapon at the suspect under these facts when he believed he was holding his Taser. But Purnell fails to under-

stand that his subjective beliefs or intentions have no place in our constitutional analysis, which concerns the objective reasonableness of the officer's conduct in light of the relevant facts and circumstances.[15] *Graham*, 490 U.S. at 397 (explaining that in resolving qualified immunity questions, courts inquire "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation"); *Harlow*, 457 U.S. at 818 (explaining that qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"). Indeed, objectivity has been the touchstone of qualified immunity law for nearly thirty years.[16] The Supreme Court has made clear that the "Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts . . . have no proper place in that inquiry." *Graham*, 490 U.S. at 399. "*[A]ll* claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* at 395 (emphasis in original). *See also Anderson*, 483 U.S. at 641 (holding that an officer's subjective belief about the nature of his conduct is "irrelevant" for qualified immunity purposes).

---

[15]Of course, an officer's subjective intentions are quite relevant on the question of whether the officer "seized" the suspect within the meaning of the Fourth Amendment, but we resolved that question against Purnell in a prior appeal, *see Henry v. Purnell*, 501 F.3d 374, 381-82 (4th Cir. 2007), and it is not now before us.

[16]There was briefly a time when qualified immunity included subjective factors, namely an officer's "permissible intentions." *Wood v. Strickland*, 420 U.S. 308, 322 (1975). But the Supreme Court soon eliminated subjective considerations altogether because "the subjective element of the good-faith defense frequently [had] proved incompatible with our admonition . . . that insubstantial claims should not proceed to trial." *Harlow v. Fitzgerald*, 457 U.S. 800, 815-816 (1982). Specifically, *Harlow* reasoned that "[j]udicial inquiry into subjective motivation therefore may entail broad-ranging discovery," which would incur "substantial costs" and be "peculiarly disruptive of effective government." *Id.* at 816-17.

Similarly, our Court has consistently conducted an objective analysis of qualified immunity claims and stressed that an officer's subjective intent or beliefs play no role. In *Melgar v. Greene*, we made clear that "'an officer's good intentions' do not make objectively unreasonable acts constitutional." 593 F.3d at 361 (citations omitted). We reiterated in *Owens v. Lott* that the qualified immunity "determination 'is an objective one, dependent not on the subjective beliefs of the particular officer at the scene, but instead on what a hypothetical, reasonable officer would have thought in those circumstances.'" 372 F.3d 267, 279 (4th Cir. 2004) (quoting *Wilson v. Kittoe*, 337 F.3d 392, 402 (4th Cir. 2003)). And in *Clem v. Corbeau*, we held that "[w]e may assume that [an officer] subjectively believed that the force he used was not excessive; that, however, is not the question. The question is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" 284 F.3d 543, 552-553 (4th Cir. 2002) (citations omitted). *See also Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) ("We do not consider the officer's 'intent or motivation.'") (citing *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996)); *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994) ("Subjective factors involving the officer's motives, intent, or propensities are not relevant.").

In the end, this may be a case where an officer committed a constitutionally unreasonable seizure as the result of an unreasonable factual mistake. If he did, he is no more protected from civil liability than are the well-meaning officers who make unreasonable legal mistakes regarding the constitutionality of their conduct. *See Pearson*, 129 S. Ct. at 815 ("The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.") (internal quotation marks omitted). Although officers are only human and even well-intentioned officers may make unreasonable mistakes on occasion, the doctrine of

qualified immunity does not serve to protect them on those occasions.

## IV.

Purnell argues that even if the district court erred in granting his summary judgment motion on the federal claim, he was nonetheless entitled to summary judgment on the state claim on the basis of statutory immunity. We disagree.

Maryland Declaration of Rights Articles 24 and 26 prohibit employment of excessive force during a seizure. *Randall v. Peaco*, 927 A.2d 83, 89 (Md. Ct. Spec. App. 2007). The standards for analyzing claims under these articles are the same as for analyzing Fourth Amendment claims. *Id.* Thus, from our conclusion that the facts, viewed in the light most favorable to Henry, showed Purnell violated Henry's Fourth Amendment rights, it follows that Purnell also violated his rights under Articles 24 and 26.

However, Maryland officials are granted immunity under the Maryland Tort Claims Act ("MTCA"), Md. Code State Gov't, §§ 12-101 *et seq.*, for state constitutional violations committed within the scope of their duties when the violations are made "without malice or gross negligence." *Lee v. Cline*, 863 A.2d 297, 307 (Md. 2004); Md. Code State Gov't §§ 12-101(a)(6), 12-105. And, "[u]nlike qualified immunity from claims of violations of federal rights under § 1983, the question of immunity for State personnel from State law torts is a subjective one." *Newell v. Runnels*, 967 A.2d 729, 763 (Md. 2009).

An officer's actions are grossly negligent when they are "so heedless and incautious as necessarily to be deemed unlawful and wanton, manifesting such a gross departure from what would be the conduct of an ordinarily careful and prudent person under the same circumstances so as to furnish evidence of indifference to consequences." *State v. Albrecht*, 649 A.2d

336, 348 (Md. 1994) (internal quotation marks and citation omitted). Whether an officer's actions are grossly negligent, and therefore unprotected by statutory immunity, is generally a question for the jury. *Taylor v. Harford County Dep't of Soc. Servs.*, 862 A.2d 1026, 1034 (Md. 2004).

We conclude that a reasonable jury could find that Purnell was grossly negligent in failing to make even a minimal effort to verify that he had drawn his Taser. Although Purnell stated that he was never "told directly" during his training, he said that "[i]t was implied" and "understood" that he should make sure that he was in fact holding his Taser rather than a firearm before firing. J.A. 512. Especially in light of the fact that the Taser and firearm were holstered on the same side of Purnell's body, a reasonable jury could conclude that such verification would only amount to common sense. In this case, in a situation where there was no particular exigency and where Purnell was attempting to arrest a nondangerous person for a relatively minor crime, a jury could reasonably find that his decision to fire his weapon without attempting to verify that he had drawn his Taser rather than his Glock amounted to gross negligence.

## V.

Purnell's use of deadly force against Henry was objectively unreasonable and violated clearly established law, namely *Tennessee v. Garner*'s prohibition against shooting suspects who pose no significant threat of death or serious physical injury to the officer or others. Nothing removes this case from the straightforward context of *Garner*. Consequently, we hold that Purnell was not entitled to qualified immunity.[17] Further-

---

[17]We recognize of course that the substantive Fourth Amendment inquiry and the matter of qualified immunity are not always one and the same. *See Saucier*, 533 U.S. at 203-07. Here, however, we think qualified immunity was properly denied and that the reasonableness of the officer's actions on the merits is a matter for the jury.

more, we hold that a jury could reasonably find that Purnell's conduct amounted to gross negligence. For these reasons, the decision of the district court is

*REVERSED AND REMANDED*.

DAVIS, Circuit Judge, concurring:

A rookie deputy sheriff (albeit one with more than two decades of relevant law enforcement experience), Deputy Purnell, having been provided with "minimal training" in the use of a Taser, goes, alone and without back-up officers, to the home of an offender, Henry, wanted on a misdemeanor warrant for failure to pay child support, to take the offender into custody on the warrant. The deputy has reason to believe, and indeed has actual knowledge, that Henry has no record of violence or threatening conduct toward law enforcement officers (or anyone else); indeed, this no doubt explains the absence of any back-up officers. When Henry pointlessly runs away from Deputy Purnell, the deputy (who is carrying his newly-issued Taser on his "dominant side" inches from his Glock service pistol) mistakenly draws his Glock (which he had never before used in the field) instead of the Taser (with which he had only practiced once before) and, despite easily measurable differences in the weight and features of the two weapons, immediately discharges his Glock pistol and shoots and wounds the offender.

I am pleased to join Judge Gregory's fine opinion for the *en banc* majority. The court holds that whether, under the totality of the circumstances of this case (properly drawing all inferences of fact in favor of Henry as the non-movant under Fed. R. Civ. P. 56), Deputy Purnell's mistaken use of his Glock pistol to shoot Henry was reasonable, is a question for the jury and not properly determined as a matter of law. I write briefly to make three observations in response to the principal dissent (hereafter, "the dissent").

*First.* The dissent (in some passages) seems to be in agreement with the *en banc* majority (and the parties) that this case does not present the hypothetical issue of whether the intentional use of the Taser by Deputy Purnell under the circumstances *would have* comported with the Fourth Amendment. *See* Dissenting Op. at 31 ("The dispositive question in this case is not whether it was reasonable for Deputy Purnell to use deadly force to stop Henry or *even whether it was reasonable for the deputy to attempt to use his Taser.*") (emphasis added); *id.* at 41 n.8 ("Henry does not claim that Deputy Purnell's decision to use the Taser was unreasonable . . . . *Therefore, we need not decide that issue.*") (emphasis added). But then, later on in the dissent, there is an implied finding on the very issue not presented: that *actual use* of the Taser would have been entirely appropriate. *See id.* at 48 (declaring, without qualification, that Deputy Purnell "made a mistake in his execution of an otherwise proper action"). It is even more perplexing that, in still another passage, the dissent *demands* an answer from the majority of the *en banc* court to *the very question that is not presented*: "[C]ould the deputy have used the Taser at all?" Dissenting Op. at 46.

The dissent's serial disclaimers that "Taser use" is at issue here does little to obscure the dissent's transparent confidence that the intentional use of a Taser by Deputy Purnell under the circumstances in the case before us *would have* comported with the Fourth Amendment. The dissent's disappointment that this case is not about "Taser use" is entirely understandable upon close scrutiny of its reasoning. This is because the entire dissent rests on the following tidy (but deeply flawed) syllogism:

> \* An officer's use of a Taser is *always permissible under the Fourth Amendment* to effect the arrest of any fleeing suspect;

> \* An officer is permitted to make reasonable mistakes in effecting seizures without thereby violating the Fourth Amendment; therefore

> \*   As a matter of law, Deputy Purnell's mistaken use of weapon one [the Glock] instead of weapon two [the Taser] to effect a seizure of the fleeing Henry was reasonable and therefore did not violate the Fourth Amendment.

In other words, under the dissent's perspective on this case, it is the very reasonableness (purportedly, as a matter of law) of the *intended* use of the Taser against an unarmed, nonviolent misdemeanant fleeing on foot that renders the *mistaken* use of the Glock "a reasonable mistake."

That this is the dissent's mode of analysis is made clear (again, despite the serial disclaimers) by the dissent's citation, as "instructive," *see* Dissenting Op. at 41 n.8, to a case decided several days after the *en banc* argument in this case, *McKenney v. Harrison*, 635 F.3d 354 (8th Cir. 2011) (affirming lower court's grant of summary judgment that use of Taser on a fleeing misdemeanor offender did not constitute an unreasonable seizure). Even a cursory examination of *McKenney*, however, demonstrates that the facts in that case are not remotely similar to the facts in the case at bar. The dissent's citation to that case in no manner undermines the majority's reasoning or the outcome in this case.

In *McKenney*, the offender had earlier fled by automobile from the arresting officer, who had made a traffic stop of the offender. *Id.* at 356-57. Three arrest warrants were issued for the offender. *Id.* Several weeks after the initial encounter during the traffic stop, the offender was actually arrested on the three warrants while in the second floor bathroom of his residence while naked. *Id.* at 357. The two arresting officers escorted the offender to a nearby bedroom and allowed him to dress before handcuffing him and removing him from the residence. *Id.* Significantly, they observed that as he was donning his clothing, he looked about suspiciously toward an uncovered window, which opened out to a porch roof below the second floor.

Upon making this observation, one officer unholstered her Taser and orally warned the suspect "not to do anything stupid," *id.*, and admonished him, "you don't want to be tased." *Id.* Despite the warning, the offender made a sudden break for the window, and the officer discharged her Taser. *Id.* As a result of being tased, the offender went through the window uncontrollably, somehow missed the porch roof or otherwise continued his fall such that he came off the porch roof and landed on the ground. He died four days later from head trauma suffered in his fall. *Id.* at 357-58.

The Eighth Circuit affirmed the district court's grant of summary judgment as to, *inter alia*, the Fourth Amendment excessive force claim instituted by the offender's mother based on the officer's use of the Taser. In affirming the district court's determination that, as a matter of law, the use of the Taser under the circumstances was not an instance of actionable Fourth Amendment excessive force, our sister circuit reasoned as follows:

> When Barnes made a sudden movement toward the window, which the officers reasonably interpreted as an active attempt to evade arrest by flight, the officers were entitled to use force to prevent Barnes's escape and effect the arrest . . . . Although the charges were limited to misdemeanors, the officers executing the warrant were not required to let Barnes run free.

> Despite the fatal consequences of the incident, the level of force employed also was not unreasonable. Pollreis used only a single Taser shock. She was required to react in a split second as Barnes sought to escape through a window only six to eight feet away. The alternative of attempting to subdue Barnes by tackling him posed a risk to the safety of the officer and did not ensure a successful arrest. The officers had warned Barnes. Just before he lunged,

> Harrison told Barnes not to do anything stupid, and Pollreis said "you don't want to be tased." And although the outcome was tragic, a reasonable officer, knowing that a Taser is designed to incapacitate instantly, could have believed that the force would incapacitate Barnes before he reached the window, while he was not in an "elevated position" and likely to fall. Under these circumstances, we conclude that the force used by Pollreis was reasonable.

*Id.* at 360 (citation and footnote omitted). It is quite clear that the circumstances of the case at bar could not be more unlike those presented in *McKenney*, which involved a suspect (who had only weeks previously sped off in an automobile from law enforcement during a traffic stop\*) in the actual custody of two law enforcement officers in a closed room, acting suspiciously as if he was planning to escape, and who ignored express oral warnings by one of the officers who had unholstered her Taser and who had it at the ready when the offender's sudden movement prompted her to discharge the Taser.

The dissent's unbridled confidence that use of a Taser would have been permissible here is unwarranted, of course, because neither party to this case has presented or argued that issue. It is unwarranted, as well, based on the thoughtful concurring opinion of Circuit Judge Murphy in *McKenney*, who forthrightly acknowledged that the objective reasonableness of the use of Tasers continues to pose difficult challenges to

---

\*Recently, in the context of the Supreme Court's evolving sentencing jurisprudence, the Court explained the commonsense reasons why a suspect's knowing or intentional use of an automobile to flee from law enforcement significantly raises the stakes in the potential for violence by such suspects. *See Sykes v. United States*, No. 09-11311, 2011 WL 2224437, \*6-8 (U.S. June 9, 2011) (holding that a conviction under Indiana law of the driver of an automobile who knowingly or intentionally flees from a police officer constitutes a "violent felony" prior conviction under the federal Armed Career Criminal Act, 18 U.S.C. § 924(e)).

law enforcement agencies and courts alike. It is, indeed, Judge Murphy's opinion that is most "instructive":

> While I concur in the opinion of the court, I believe that law enforcement use of tasers merits further reflection. This case illustrates one kind of tragic result that can follow the employment of a taser. The developing law on taser use must consider the unique nature of this type of weapon and the increased potential for possibly lethal results created by newer models.
>
> Our cases have reacted to a variety of circumstances where tasers have been used, and they sometimes reflect unexpected consequences. In *Mahamed v. Anderson*, 612 F.3d 1084, 1086 (8th Cir. 2010), for example, a jailer used a taser on a screaming inmate lying on the floor of his own locked cell. The taser probes lodged in the inmate's testicle and hand, assertedly causing long term impotence, incontinence, and nerve damage. Qualified immunity was denied the jailer in that case. *Id.* at 1087. An officer who tased a woman refusing to leave her car during a traffic stop was also denied qualified immunity. *Brown v. City of Golden Valley*, 574 F.3d 491, 499-500 (8th Cir. 2009). A panel majority granted summary judgment in *Cook v. City of Bella Villa*, 582 F.3d 840, 849 (8th Cir. 2009), to an officer who had tased an angry man approaching him while he was trying to arrest the man's wife. Judge Shepherd dissented after concluding that it was unreasonable to "discharge [a] Taser simply because of insolence," especially given the tremendous pain tasers cause. *Id.* at 859-60.
>
> In deciding claims of excessive force, we balance "the nature and quality of the intrusion . . . against the countervailing governmental interests at stake."

*Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see* Maj. Op. at 359. As we have previously observed, "case law related to the Taser is [in the] developing" stage. *Brown*, 574 F.3d at 498 n. 5. While "the Taser, in general, is more than a non-serious or trivial use of force but less than deadly force . . . , there is a lot of room between those end points." *Mattos v. Agarano*, 590 F.3d 1082, 1087 (9th Cir. 2010).

That the law is still evolving is illustrated in cases granting qualified immunity for that very reason. *See, e.g., Bell v. Kansas City Police Dep't*, No. 08-456, at 4-5 (W.D.Mo. Mar. 22, 2010) (granting qualified immunity to police officer in "close case" because "there is not enough law warning defendant against tasering to justify this [excessive force] litigation"). Local law enforcement policies also reflect differing views of where the taser fits on the "force continuum." Some allow taser use only as an alternative to deadly force, while others call for taser use whenever any force is justified. U.S. Gov't Accountability Office, GAO-05-464 Taser Weapons: Use of Tasers by Selected Law Enforcement Agencies 9-10 (2005) ("GAO Report").

\*    \*    \*

In this case Officer Pollreis used her taser's dart mode on James Barnes when she perceived that he might try to escape out a window. The taser's two metal probes lodged in his lower back. The weapon then did exactly what it was designed to do: it completely incapacitated Barnes's entire body. Instead of falling to the floor as Pollreis expected, Barnes smashed through the window and over the porch and fell onto the ground. The taser's paralyzing effect apparently made Barnes unable to break his fall, and

he died of massive brain trauma a few days later. Even though the officers were serving only misdemeanor warrants, Pollreis was faced with "circumstances that [were] tense, uncertain, and rapidly evolving," *Graham*, 490 U.S. at 397, 109 S.Ct. 1865, and she mistakenly believed she could stop Barnes safely. She was wrong.

Just as officers may use guns only against suspects posing a threat of serious physical harm, *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the use of tasers requires sufficient justification for their use to be reasonable. The Supreme Court refused to let "police technology . . . erode the privacy guaranteed by the Fourth Amendment" in *Kyllo v. United States*, 533 U.S. 27, 34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), and the particular factual circumstances in which a taser has been used must be examined in the context of Fourth Amendment protections against excessive force.

*Id.* at 361-64.

Judge Murphy's insightful observations wisely counsel caution against a hasty determination of the reasonableness *vel non* of Taser use by law enforcement officers *in the abstract*. *See also Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) ("We have previously held that in a 'difficult, tense and uncertain situation' *the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force*. *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004).") (emphasis added); *Parker v. Gerrish*, 547 F.3d 1, 8-11 (1st Cir. 2008) (affirming jury verdict that officer used excessive force in tasering an arrestee).

Henry chose not to assert a *hypothetical* claim of excessive force based on Deputy's Purnell's *intended* use of the Taser

in the circumstances of this case, and the majority of the *en banc* court appropriately leaves for another day (and for consideration in a case in which the issue is actually presented) determination of that issue.

*Second.* The dissent protests that "[its] analysis does not even address, much less justify, *the intentional use of deadly force*." Dissenting Op. at 43 n.10. And yet, one of the principal cases on which the dissent relies to support its conclusion that Henry failed to project sufficient evidence that Deputy Purnell committed a Fourth Amendment excessive force violation involved an officer's "intentional use of deadly force." *See* Dissenting Op. at 38, 43-44 (citing, quoting, and reasoning on the basis of *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001)). *Russell* was not a case of "mistaken" use of deadly force; to the contrary, it was a case in which the use of deadly force was, manifestly, "intentional."

There, a local police officer, Russell, working supplemental employment as a shopping mall security guard, learned from a mall patron that an intoxicated man, Anderson, wearing earphones and a hat, who was openly drinking wine while walking around the mall, appeared to be armed. *Id.* at 127-28. Thereafter, Russell surveilled and observed Anderson for more than twenty minutes and, specifically, he observed a bulge under Anderson's sweater precisely where one might expect a firearm to be secreted, thereby "corroborating the citizen's report." *Id.* at 128. Thus, as the panel in *Russell* correctly recognized, the officer had at least reasonable suspicion to seize the man, make inquiry, and to conduct a pat down search, and to do so in a manner that provided an assurance of safety for the officers and any persons in the immediate area. *Id.* at 130 ("Once Russell perceived a bulge consistent with the shape of a gun, he was justified in believing that Anderson was armed and dangerous.").

With their guns drawn, Russell and another officer confronted Anderson and ordered Anderson to "raise his hands

and get down on his knees." *Id.* Although Anderson at first raised his hands, before the officers could conduct a pat-down and secure the situation, he began lowering his hands and "reaching toward what Russell believed to be a gun." *Id.* at 131. Thus, Officer Russell, having more than a reasonable basis for believing that the man was armed and that he was reaching for a firearm in defiance of a direct order by the police, shot Anderson three times. *Id.* In fact, the bulge observed by the mall patron (and later, by the officer) was an eyeglass case. Anderson (who was wearing earphones) had been reaching to remove the radio from his back pocket; he was not armed. *Id.*

Anderson survived his wounds and sought damages against the shooter pursuant to § 1983 based on Russell's alleged excessive force in effecting a seizure in violation of the Fourth Amendment. The jury returned a verdict for Anderson, finding that (1) the officer used excessive force and (2) the officer was not entitled to qualified immunity. Officer Russell renewed his motion for judgment as to each of those issues after the verdict; the district court denied the motion as to excessive force but granted the motion as to qualified immunity. On cross-appeals by the parties, we concluded, as mentioned above, that "as a matter of law, Russell's use of force did not violate the Fourth Amendment and, therefore, that the § 1983 excessive force claim should not have been submitted to the jury." *Id.* at 129.

Thus, *Russell* was not a case of a "mistake" in any sense relevant to the case at bar. Both the mall patron and the surveilling officer drew an inference, *a reasonable inference*, as this court repeatedly noted, that the man was armed and, indeed, later, that he was attempting to draw a firearm in response to an order by the officer that he raise his hands. A reasonable inference based on percipient witness observations is nonetheless *reasonable* even where the *factual basis* underlying the inference is other than as supposed. Such a reasonable inference is not for that reason a *mistaken* inference.

Most assuredly, in *Russell*, the officer intended to discharge his firearm at the suspect, and he did so, shooting him three times.

Like so many of the other cases relied on by the dissent, e.g., those dealing with *mistaken searches of the wrong apartment*, *Russell* bears no resemblance whatsoever to the case at bar. Plainly, an accumulation of abstract legal propositions extracted from dissimilar cases provides scant assistance in the decision of actual cases; rather, it is the careful application of legal principles to the summary judgment record presented before us that does so.

*Third.* The dissent apparently finds it odd that the majority is not granting summary judgment *in favor* of Plaintiff Henry since, in its view, there is no genuine dispute of material fact evident in this record. That is plainly incorrect. The dissent asserts, and all agree, that where there exists no genuine dispute of material fact, the objective reasonableness of *a particular use of force* is an issue of law for the court. *Scott v. Harris*, 550 U.S. 372, 378-79 & n.5 (2007) (holding that video recording of plaintiff's encounter with police "sp[oke] for itself" and established the absence of any genuine dispute of material fact bearing on objective reasonableness). In the case at bar, of course, the issue is not the reasonableness of Deputy Purnell's use of his Glock to seize Henry. *All agree that the use of the Glock to seize Henry was unreasonable under the facts and circumstances of this case*. The issue presented, as the dissent further acknowledges, is the reasonableness of Deputy Purnell's *mistake* in unholstering and discharging his Glock. If the mistake was reasonable, then the Fourth Amendment renders the seizure reasonable. As the majority opinion makes perfectly clear, *genuine disputes of material historical and inferential facts absolutely surround the issue of the reasonableness of Deputy Purnell's mistake*, and a jury of his peers is the proper factfinder as to the ultimate question. The dissent's insistence on blinking at those facts and circumstances, or its inability or refusal to draw

those inferences in favor of Henry because, as discussed above, it wants this case to be about *the intended use of the Taser*, does not alter that reality. *Cf. Scott*, 550 U.S. at 383 ("[I]n the end we must still slosh our way through the fact-bound morass of 'reasonableness.'").

With these additional observations, I am pleased to join Judge Gregory's opinion for the *en banc* court.

SHEDD, Circuit Judge, dissenting:

Deputy Purnell, an experienced law enforcement officer, attempted to arrest Henry pursuant to a lawful warrant. Before the deputy could search Henry for weapons, Henry fled toward his residence. The parties have stipulated that during the ensuing foot chase, Deputy Purnell "intended to unholster and discharge his Taser M26" but, instead, "unholstered and fired his service weapon, believing that it was his Taser M26." J.A. 30. Deputy Purnell unfortunately shot Henry with his firearm as a result of this mistake.

The dispositive question in this case is not whether it was reasonable for Deputy Purnell to use deadly force to stop Henry or even whether it was reasonable for the deputy to attempt to use his Taser. Rather, the question is whether the deputy's *mistake* in drawing and firing his Glock while in hot pursuit of Henry was constitutionally reasonable. *See Henry v. Purnell*, 501 F.3d 374 (4th Cir. 2007) ("*Henry I*").[1] When properly viewed in light of controlling precedent, which counsels that we must view the facts of this potentially dangerous arrest without engaging in hindsight second-guessing, the

---

[1] In *Henry I*, we noted: "Purnell does not argue that an intentional use of the Glock would have been reasonable; likewise, Henry does not argue that Purnell's decision to use the Taser was unreasonable." 501 F.3d at 382 n.11. Further, we remanded the case for the district court to determine in the first instance whether Henry had met his burden of establishing that Purnell's mistake in using the Glock rather than the Taser was unreasonable. *Id.* at 384.

undisputed material evidence clearly establishes that the deputy's mistake is constitutionally reasonable. Accordingly, Henry has failed as a matter of law to meet his burden of establishing a Fourth Amendment violation, and the district court properly granted summary judgment in favor of Deputy Purnell on Henry's federal and state-law claims on that basis.[2]

I

For our purposes, the material facts are undisputed.[3] On October 23, 2003, Deputy Purnell attempted to arrest Henry pursuant to a lawful warrant. The warrant charged Henry with second degree escape based on his failure to comply with a court order to report to the county detention center for service of a 47-day sentence.[4]

---

[2]There are, of course, two separate issues in a case such as this, where an officer asserts qualified immunity: (1) whether the plaintiff has established that the defendant violated a constitutional right and (2) if so, whether the defendant is entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223 (2009). Although the majority states that I am somehow "avoiding" the issue of qualified immunity, *see Majority Op.*, at 14 n.14, my view that Henry has failed to establish a Fourth Amendment violation renders it unnecessary for me to address qualified immunity. Thus, what the majority views as my "avoidance" of the issue is, in fact, entirely proper. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

[3]The only potentially material fact that is in dispute is whether Henry pushed Deputy Purnell when he began to flee. For purposes of my conclusion that Deputy Purnell did not violate the Fourth Amendment, I accept Henry's version that he did not push the deputy, and this factual issue is therefore immaterial. Of course, if this issue is ultimately resolved in Deputy Purnell's favor, it would further underscore the reasonableness of his actions.

[4]Under Maryland law, an individual who knowingly fails to obey a court order to report to a place of confinement is guilty of the misdemeanor crime of second degree escape and is subject to a term of imprisonment not exceeding 3 years or a fine not exceeding $5,000, or both. MD

The attempted arrest occurred in Henry's driveway, where Henry was one of three people in a parked truck. Deputy Purnell, who was alone, approached the vehicle, and Henry eventually acknowledged his identity. After Deputy Purnell advised Henry that he had a warrant for his arrest, Henry exited the vehicle. The driver of the vehicle and the other passenger remained inside.

Henry initially appeared cooperative after exiting the vehicle, but he fled toward his trailer before Deputy Purnell could arrest him. At that time, Deputy Purnell did not know whether Henry was armed or whether he was fleeing in an attempt to arm himself. As Deputy Purnell explained:

Q: And what danger did you feel that you were in?

A: Because [Henry] was in his neighborhood, he could have gone anywhere, gotten anything, could have run to the back, gotten a shovel, gone back in the house, gotten a gun. Anything. Besides that, I didn't know if he had anything on him. I never had an opportunity to search him.

. . .

Q: At that point . . . did you consider him a dangerous or violent subject?

A: Yes.

---

Code Ann., Crim. Law, § 9-405. A state judge had ordered Henry to report to the Somerset County Detention Center on September 8, 2003, to serve a term of 47 days, but also provided him with an opportunity to avoid having to serve the sentence by complying with certain requirements. Henry neither complied with those requirements nor reported to serve his sentence.

. . .

Q:   And did you perceive him as a threat as he con-
     tinued to run?

A:   Yes, sir.

Q:   Because he may have gotten a weapon; is that
     correct?

A:   That's correct, sir.

Q:   And during this entire time that he was run-
     ning, your opinion did not change —?

A:   That's correct.

J.A. 258-61.

After Henry fled, Deputy Purnell began a chase that lasted 3-5 seconds. While he was running, Deputy Purnell kept his eyes focused on the fleeing Henry, and he reached for his Taser, which was holstered on his right side below his Glock. However, Deputy Purnell mistakenly drew his Glock rather than his Taser. Because he was running and focused on Henry, Deputy Purnell did not realize that he had mistakenly unholstered the Glock. As Henry continued to flee, Deputy Purnell — believing that he was holding the Taser — shot Henry in the arm. Henry then began to slow down, and Deputy Purnell quickly overtook him.[5]

Deputy Purnell immediately recognized his mistake, and he told Henry that he had not intended to shoot him. He then

---

[5]Because Deputy Purnell was attempting to lawfully arrest Henry, and Henry has stipulated that Deputy Purnell mistakenly used his firearm, the fact that Deputy Purnell may have been annoyed at Henry for "pulling a whammy" on him (*see Majority Op.*, at 3) on an earlier date is immaterial.

escorted Henry back to the truck and radioed for medical assistance. Deputy Purnell rendered first-aid to Henry, and he permitted Henry's companions to exit the truck and assist him. During this time, he reiterated that he had grabbed the Glock by mistake and never intended to shoot Henry. Deputy Purnell remained with Henry until other law enforcement units arrived and relieved him.

At the time of this incident, Deputy Purnell had been employed with the Somerset County Sheriff's Office for approximately one year. Before that, he spent 25 years as an officer with the Maryland Natural Resources Police. Deputy Purnell had only been carrying the Taser for a few months before this incident, and he had never previously deployed it in the field. Indeed, he had only used it one time in a training exercise. Likewise, he had only been carrying the Glock for a relatively short time, and he had never fired it in the field. He carried the Taser and Glock on the same side of his body (his dominant side) in a holster because he had been instructed to do so. Although there are differences between the two weapons, such as their weight and the manner in which they function, the Taser and the Glock appear to be remarkably similar in shape. *See* J.A. 288-89.

Approximately two months before the shooting, the Somerset County Sheriff issued Special Order 03-04, regarding Taser usage. Among other things, that order explains that the Taser could be used "to control a dangerous or violent subject when deadly force is not justified and attempts to control the subject by other tactics have been ineffective," and "to safely effect an arrest." J.A. 285. It also instructs that "[w]hen practical" officers should use verbal commands and point the laser sight at the subject before discharging it. J.A. 286.[6]

---

[6]I note this order merely for background purposes, and I do not contend that Deputy Purnell's compliance with it is pertinent to the Fourth Amendment analysis. *See Abney v. Coe*, 493 F.3d 412, 419 (4th Cir. 2007) ("It is . . . settled law that a violation of departmental policy does not equate with constitutional unreasonableness.").

II

"It goes without saying that the Fourth Amendment bars only unreasonable searches and seizures." *Maryland v. Buie*, 494 U.S. 325, 331 (1990). The purpose of the Fourth Amendment is "to protect the people of the United States against arbitrary action by their own Government," *United States v. Verdugo-Urquidez*, 494 U.S. 259, 266 (1990), and it "addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct," *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) (citation omitted). Section 1983 (42 U.S.C.) allows a plaintiff "to seek money damages from government officials who have violated his Fourth Amendment rights," *Wilson v. Layne*, 526 U.S. 603, 609 (1999), but it "does not purport to redress injuries resulting from reasonable mistakes," *McLenagan v. Karnes*, 27 F.3d 1002, 1008 (4th Cir. 1994).[7]

A.

Arrest is, of course, a form of seizure, and "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In considering whether an officer acted reasonably in making an arrest, we must bear in mind that "American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded." *Terry v. Ohio*, 392 U.S. 1, 23 (1968). Thus, "[t]he public interest . . . includes the substantial public concern for the safety of police officers lawfully carrying out the law enforcement effort." *United States v. Sakyi*, 160 F.3d 164, 167 (4th Cir. 1998).

---

[7]The standard for liability on Henry's federal and state-law claims is the same. *See Henry I*, 501 F.3d at 382 n.10.

A "custodial arrest is fluid and '[the] danger to the police officer flows from *the fact of the arrest*, and its attendant proximity, stress, and uncertainty.'" *Thornton v. United States*, 541 U.S. 615, 621 (2004) (citation omitted) (emphasis in original). Because "[t]here is no way for an officer to predict reliably how a particular subject will react to arrest or the degree of the potential danger," "*[e]very arrest* must be presumed to present a risk of danger to the arresting officer." *Washington v. Chrisman*, 455 U.S. 1, 7 (1982) (emphasis added). The risk to the officer is heightened when an arrestee flees, as "[t]he act of resisting arrest poses a threat of direct confrontation between a police officer and the subject of the arrest, creating the potential for serious physical injury to the officer and others." *United States v. Wardrick*, 350 F.3d 446, 455 (4th Cir. 2003).

B.

"What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya De Hernandez*, 473 U.S. 531, 537 (1985). "Because of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case." *Scott v. United States*, 436 U.S. 128, 139 (1978). "[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract," *United States v. Ventresca*, 380 U.S. 102, 108 (1965), and "[w]e are to approach the Fourth Amendment . . . with at least some measure of pragmatism" and to avoid "pressing inflexible rules," *Mora v. City of Gaithersburg, MD*, 519 F.3d 216, 222 (4th Cir. 2008).

"A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985). However, reasonableness for purposes of the Fourth Amendment "is evaluated from the perspective of the officer

on the scene, not through the more leisurely lens of hindsight." *Abney*, 493 F.3d at 416; *see also Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2004) (noting that "reasonableness is determined based on the information possessed by the officer at the moment that force is employed"). As Judge Wilkinson of this Court recently noted: "It's always tempting to go the could-have/should-have route in hindsight, but that is not how the Supreme Court has structured the objective reasonableness inquiry." *Hunsberger v. Wood*, 583 F.3d 219, 222 (4th Cir. 2009) (Wilkinson, J., concurring in denial of rehearing *en banc*). For this reason, courts should not "second-guess the split-second judgment of a trained police officer merely because that judgment turns out to be mistaken. . . ." *McLenagan*, 27 F.3d at 1007-08.

The Fourth Amendment "does not require omniscience," and officers "'need not be absolutely sure . . . of the nature of the threat or the suspect's intent to cause them harm'" before using force. *Anderson v. Russell*, 247 F.3d 125, 132 (4th Cir. 2001) (quoting *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996). Moreover, "[o]fficers are not required to use the least intrusive means available; they simply must act within the range of reasonable conduct." *Brooks v. City of Seattle*, 599 F.3d 1018, 1025 (9th Cir. 2010); *see also Board of Ed. of Ind. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 837 (2002) (noting that "this Court has repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means, because '[t]he logic of such elaborate less-restrictive alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.'" (citation omitted)).

Importantly, reasonableness "does not, by definition, entail perfection," *United States v. Phillips*, 588 F.3d 218, 227 (4th Cir. 2009), and courts must "allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests," *Maryland v. Garrison*, 480 U.S. 79, 87 (1987). Elaborating on this point, the Supreme

Court has stated: "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). Accordingly, "a mistaken understanding of the facts that is reasonable in the circumstances can render a seizure based on that understanding reasonable under the Fourth Amendment." *Milstead v. Kibler*, 243 F.3d 157, 165 (4th Cir. 2001). Nearly two decades ago, our *en banc* Court recognized the chilling effect that a contrary rule would have on law enforcement: "If every mistaken seizure were to subject police officers to personal liability under § 1983, those same officers would come to realize that the safe and cautious course was always to take no action." *Gooden v. Howard County, Md.*, 954 F.2d 960, 967 (4th Cir. 1992) (*en banc*); *see also Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991) ("If reasonable mistakes were actionable, difficult questions of discretion would always be resolved in favor of inaction, and effective law enforcement would be lost.").

Both the Supreme Court and this Court have repeatedly found that reasonable mistakes made by law enforcement officers did not constitute Fourth Amendment violations. For example, in *Garrison*, *Mazuz v. Maryland*, 442 F.3d 217 (4th Cir. 2006), and *United States v. Patterson*, 278 F.3d 315 (4th Cir. 2002), the officers' mistaken searches of the wrong premises were found to be constitutionally reasonable. Similarly, in *Illinois v. Rodriguez*, 497 U.S. 177 (1990), the officers' mistaken belief that they had third-party consent to enter and search a premises was found to be constitutionally reasonable. Likewise, in *Hill v. California*, 401 U.S. 797 (1971), the Court found a mistaken arrest of the wrong person to be reasonable under the Fourth Amendment.

Our decision in *Milstead* is particularly instructive. There, the police officer had intended to shoot a fleeing criminal suspect, but he mistakenly shot and killed an innocent person. We held that the officer's seizure of the innocent person did

not violate the Fourth Amendment because the officer's mistake was reasonable. *See also Culosi v. Bullock*, 596 F.3d 195, 201 (4th Cir. 2010) ("A mistaken use of deadly force . . . is not necessarily a constitutional violation under the Fourth Amendment.").

None of these cases involves the precise factual situation present here, "but, as in all Fourth Amendment cases, we are obliged to look to all the facts and circumstances of this case in light of the principles set forth" in prior precedent. *South Dakota v. Opperman*, 428 U.S. 364, 375 (1976). These cases instruct that where, as here, an officer has made a mistake during a search or seizure, we must consider the facts and circumstances as the officer perceived them and then apply an objective standard over those facts to determine whether the officer's mistake was reasonable. In doing so, we must avoid the temptation to second-guess the officer's actions, especially in a case involving an exigency such as hot pursuit.

C.

Henry bears the burden of proof on the issue of whether a constitutional violation occurred. *Henry I*, 501 F.3d at 377. We review an award of summary judgment *de novo*, applying the same familiar Rule 56 standards applicable in the district court. *See Laber v. Harvey*, 438 F.3d 404, 415 (4th Cir. 2006) (*en banc*). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For purposes of summary judgment consideration, the substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007), the Supreme Court instructed that at the summary judgment stage, once a court has determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the

extent supportable by the record, the reasonableness of an officer's actions for Fourth Amendment purposes "is a pure question of law" to be decided by the court rather than the jury. In my view, the district court properly analyzed this case and reached the correct result.

What I stated above bears repeating: the Fourth Amendment does not address the accidental effects of otherwise lawful government conduct, and § 1983 does not purport to redress injuries resulting from reasonable mistakes. The undisputed material facts establish as a matter of law that Deputy Purnell in no way intentionally "misused" the power of his office. Rather, he was lawfully attempting to arrest Henry, which in itself is a potentially dangerous encounter, and Henry heightened the danger by his decision to flee. Properly recognizing the limitation on the use of deadly force, Deputy Purnell attempted to use the Taser to stop Henry.[8] In

---

[8]As noted, "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Henry does not claim that Deputy Purnell's *decision* to use the Taser was unreasonable. *See Henry I*, 501 F.3d at 382 n.11. Therefore, we need not decide that issue. Nonetheless, I believe that a recent case from the Eighth Circuit is instructive on this issue.

In *McKenney v. Harrison*, 635 F.3d 354 (8th Cir. 2011), the police used a Taser while attempting to stop a misdemeanant suspect from fleeing from arrest. Upon being hit by the Taser, the suspect fell out of a second-story window to his death. In support of the suspect's § 1983 lawsuit, which was predicated on the Fourth Amendment, the administrator of the suspect's estate argued that the Taser use was excessive because the arrest warrants were based on minor offenses, the suspect never threatened the officers, the officers had no reason to believe that the suspect had a weapon, and the result of the force was the suspect's death. The administrator also argued that a rational jury could have found that the officer failed to follow police department procedures by (among other things) not calling out "Taser" before deploying it. 635 F.3d at 359-60.

Properly recognizing that the reasonableness of the officer's actions must not be judged in hindsight, the Eighth Circuit affirmed the entry of summary judgment in favor of the officers. In reaching this conclusion, the court held that the officers could have reasonably interpreted the sus-

the rapidly evolving situation, Deputy Purnell mistakenly drew the Glock and fired it.

Again, the Supreme Court has instructed that we must "allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests." *Garrison*, 480 U.S. at 87. Deputy Purnell's mistake is indeed unfortunate, but it was nonetheless one that was made in the tense and potentially dangerous circumstances arising from Henry's flight from arrest. Henry has failed to present any material evidence to demonstrate that this mistake was anything other than an *honest one*.[9] Therefore, the mis-

---

pect's sudden movement toward the window during the arrest as an attempt to evade arrest, and they were thus entitled to use force to prevent the suspect's escape. The court noted that "[a]lthough the charges were limited to misdemeanors, the officers executing the warrant were not required to let [the suspect] run free." *Id.* at 360. The court further held that despite the fact that the suspect died, the use of the Taser was not excessive. The court pointed out that the officer "was required to react in a split second as [the suspect] sought to escape through a window only six to eight feet away," and "[t]he alternative of attempting to subdue [the suspect] by tackling him posed a risk to the safety of the officer and did not ensure a successful arrest." *Id.*

*McKenney* is not binding precedent for this Court. However, it certainly suggests that Deputy Purnell acted reasonably in making the decision to use the Taser. Even before the day in question, Henry had demonstrated his intent to avoid apprehension, and his flight from arrest simply confirmed that intent. Like the officers in *McKenney*, had Deputy Purnell decided against using the Taser, his options were either to (1) stop chasing Henry and allow him to get away or (2) chase Henry and risk having to engage him in a physical encounter (assuming he could even catch him). Of course, under either option, Deputy Purnell faced the prospect that Henry was either armed or could arm himself during his flight. Unquestionably, the Fourth Amendment did not require Deputy Purnell to pursue either of these courses of action.

[9]The majority chides Deputy Purnell for arguing that he is entitled to summary judgment because he made an "honest mistake," noting that it is "not the honesty of Purnell's intentions that determines the constitutionality of his conduct." *See Majority Op.*, at 12. Of course, "honest mistake"

take is reasonable within the meaning of the Fourth Amendment as a matter of law. For this reason, Deputy Purnell did not violate Henry's Fourth Amendment right to be free from an unreasonable seizure, and summary judgment in the deputy's favor is appropriate. *See, e.g.*, *Russell*, 247 F.3d at 130 ("Given the uncontroverted evidence *as to what Russell perceived* immediately before firing, we do not believe that there is a legally sufficient evidentiary basis for a rational jury to find for Anderson on the issue of excessive force. Accordingly, we hold that Russell was entitled to judgment as a matter of law on the excessive force claim." (emphasis added)).[10]

## D.

The majority concludes otherwise, holding that the question of whether Henry has established a Fourth Amendment viola-

---

is a term of common parlance denoting an act that is done unintentionally and without malice. The "honest mistake" standard relied upon by Deputy Purnell comes directly from Supreme Court precedent, and it obviously refers to an objectively reasonable mistake. However, in assessing the objective reasonableness of the mistake, we must consider the officer's subjective intention in order to understand that he in fact made a mistake. *See, e.g.*, *Hill*, 401 U.S. at 803-04 ("The upshot was that the officers in good faith believed Miller was Hill and arrested him. They were quite wrong as it turned out, and subjective good-faith belief would not in itself justify either the arrest or the subsequent search. But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time.").

[10]The majority asserts that my analysis "implies that all fleeing suspects may be apprehended through the use of deadly force." *See Majority Op.*, at 12 n.9. Either the majority misunderstands or is indifferent to the controlling law, the material facts, or my opinion. To be clear, when analyzed properly, this case is not about the reasonableness of Deputy Purnell's use of deadly force. It is about the reasonableness of his stipulated mistake in attempting to use what he believed to be a Taser. My analysis does not even address, much less justify, the *intentional* use of deadly force, which even Henry agrees is not present.

tion is for a jury. In doing so, the majority equates Deputy Purnell's conduct with that of a rogue officer who intentionally shoots at an unarmed misdemeanant. *See Majority Op.*, at 11 ("The objective circumstances of this case are that Purnell shot a fleeing suspected misdemeanant whom he had no reason to believe was a threat."). I believe the majority erroneously reaches this conclusion by improperly viewing this case through the lens of hindsight to minimize not only the inherent danger involved in *every* arrest, but also the specific danger in *this* case that stemmed from Henry's decision to flee before being searched.

For example, the majority repeatedly emphasizes that the arrest warrant was for a relatively minor crime. *See, e.g.*, *Majority Op.*, at 3, 11. However, the danger faced by an officer making a custodial arrest flows from the fact of the arrest itself and "not from the grounds for arrest." *United States v. Robinson*, 414 U.S. 218, 234 n.5 (1973). Moreover, as we explained in *Russell*, even if the suspected criminal activity is relatively minor, "that factor would prove irrelevant to our excessive force analysis because our focus is on the circumstances as they existed at the moment force was used." 247 F.3d at 132.[11]

The majority further states that "critically, this case presents nothing to suggest Henry posed any threat whatsoever — no menacing conduct and no violent criminal history." *Majority Op.*, at 11. This assertion incorrectly focuses on

---

[11]Even the most seemingly minor arrest can lead to tragic consequences for law enforcement officers. *See, e.g.*, *State v. Bryant*, 642 S.E.2d 582, 585 (S.C. 2007) ("In June 2000, Cpl. Dennis Lyden . . . was placing Bryant under arrest *for driving with a suspended license* when Bryant suddenly turned and wrestled Cpl. Lyden to the ground. During the course of the struggle, Bryant managed to obtain Cpl. Lyden's flashlight and pistol magazine from the officer's duty belt and used them to severely beat Cpl. Lyden about the head. After beating the officer unconscious, Bryant took Cpl. Lyden's pistol from his holster and shot him in the head at close range." (emphasis added)).

Henry, the arrestee, and ignores the Supreme Court's admonition concerning the potential danger that flows from the fact of the arrest itself, as well as our admonition that an act of resistance increases the danger to both an officer and bystanders. Without question, a suspect's known dangerousness can *heighten* the potential danger of an arrest, but the fact that a suspect may not appear at first glance to be dangerous does not necessarily negate the inherent danger of the arrest.

In any event, the majority's assertion ignores the specific, undisputed fact that at the time Henry fled, Deputy Purnell had no way of knowing if he was dangerous because, among other reasons, he had not yet searched him. *See Knowles v. Iowa*, 525 U.S. 113, 118 (1998) (noting that "the authority to conduct a full field search as incident to an arrest [is] a 'bright-line rule,' which [is] based on the concern for officer safety"). Moreover, Henry's flight, which allowed him to evade the search incident to the arrest certainly was sufficient to cause the deputy, like any reasonable officer, to suspect that Henry, like any other suspect in similar circumstances, may have been concealing something on his person. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight — wherever it occurs — is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). Incredibly, the majority discounts any potential danger arising from the arrest and Henry's flight because Deputy Purnell knew such mundane facts as where Henry lived, who his wife and former employer are, and that he had some vague intention of posting bail after he was arrested. *See Majority Op.*, at 11. Surely, the majority must concede that facts of this nature could be present in cases involving even the most dangerous of individuals.[12]

---

[12]Henry was running in the direction of his trailer. Had he entered the trailer before Deputy Purnell was able to catch him, the deputy would have been entitled to follow him inside to apprehend him. *See United States v. Santana*, 427 U.S. 38, 42-43 (1976). Of course, the potential danger to the deputy would have been magnified in that instance. *See Buie*,

Simply put, under the majority's view of the facts, Henry presented no danger at all to Deputy Purnell. Of course, this raises the question of what the majority would have had the deputy do in this situation. It is not enough merely to declare that he should have been more careful. Rather, the context of this incident matters, and the objective reasonableness test must factor in that context. If, as the majority believes, this was not a dangerous situation, could the deputy have used the Taser at all? Should the deputy have been required to forego use of the Taser and, instead, to chase Henry with the hope of catching up to him and subduing him by physical force, an act that would have subjected both men to the risk of significant injury (and a possible excessive force claim against Deputy Purnell), or should he have simply let Henry run away, taking solace in the fact that he knew who his wife is and where he lived? As I noted earlier, the Fourth Amendment does not require a law enforcement officer to resort to these lesser alternatives.

In addition to erroneously minimizing the potentially dangerous nature of this arrest, the majority also errs by engaging in inappropriate second-guessing. *See, e.g.*, *Majority Op.*, at 12-14. Perhaps the most telling example of this is contained in the following passage:

> As he pursued Henry in an attempt to arrest him for a fairly minor, non-violent crime, Henry had his back to Purnell and was not threatening him or anyone else in any way. There was no evidence indicating that Purnell did not have the split-second he

494 U.S. at 333 ("The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. . . . [U]nlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.").

> would have needed to at least glance at the weapon he was holding to verify that it was indeed his Taser and not his Glock.

*Majority Op.*, at 13-14. Of course, we *now* know that Henry — who "had his back to Purnell" — was not armed. However, Deputy Purnell did not have the luxury of that knowledge in the rapidly evolving situation, and he did what officers are trained to do: he focused on the fleeing suspect, who could have turned with a weapon at any moment, in order to protect himself and any innocent bystanders. The majority's belief that the deputy should have taken a "split-second" to focus his attention away from Henry might be fine in a perfect world, but in the real world it is those split-seconds during which law enforcement officers (and bystanders) are wounded or killed.[13]

---

[13]Most states, including Maryland, have waived sovereign immunity and permit some claims for injury from the negligent acts of state employees. A potential right to recover for such negligence, however, has no bearing on the entirely separate issue of whether a federal constitutional claim against the officer is cognizable under § 1983. As we have explained, "allegations of a defendant's negligence do not state constitutional claims against such a defendant." *Covenant Media of SC, LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007) (citation and punctuation omitted); *see also Dow Chem. Co. v. United States*, 476 U.S. 227, 232 (1986) ("State tort law does not define the limits of the Fourth Amendment.").

Moreover, even if Deputy Purnell was insufficiently trained to use the Taser, it is difficult to discern how his potential personal liability for a constitutional violation hinges on whether his superiors adequately trained him. *Cf. City of Canton, OH v. Harris*, 489 U.S. 378, 391 (1989) (noting that "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable"). To the extent that the training issue has been involved in this case, it arose during proceedings in the district court, and we did not endorse its relevance in *Henry I. See* 501 F.3d at 383 (quoting district court orders regarding training); 501 F.3d at 384 ("Apart from our determination that a seizure occurred, we express no opinion on the ultimate merits of the case.").

### III

In closing, I cannot help but reflect upon the peculiar result created by the majority's decision when compared to our prior precedent. In *Robles v. Prince George's County, Md.*, 302 F.3d 262, 271 (4th Cir. 2002), we held that police officers who tied an arrestee to a metal pole in a deserted parking lot and left him there in the middle of the night were immune from federal constitutional liability even though they "should have known, and indeed did know, that they were acting inappropriately." We did so while noting that their conduct was a "type of Keystone Kop activity that degrades those subject to detention and that lacks any conceivable law enforcement purpose." *Id.*

The same certainly cannot be said about Deputy Purnell's conduct. Instead of doing something that he knew was inappropriate, Deputy Purnell attempted to do the right thing under the rapidly evolving and potentially dangerous circumstances he was in. However, because he made a mistake in his execution of an otherwise proper action, he (unlike the "Keystone Kops" in *Robles*) is potentially personally liable for monetary damages under § 1983. This does not accord with the practical construction which must be given to the Fourth Amendment.[14] *Cf. Gooden*, 954 F.2d at 967 ("It is a misguided application of § 1983 to expose to liability those who by all objective indicia were only trying to help."). As we recently stated in *Melgar v. Greene*, 593 F.3d 348, 361 (4th Cir. 2010), "undisputed good intentions should not be used to make an officer a *more* inviting target for monetary damages." (emphasis in original). Yet, compared to *Robles*, that is exactly the result reached by the majority today.

---

[14]I recognize that in *Robles* we held that the officers violated the plaintiff's constitutional rights and granted them qualified immunity. Although in my view we need not decide the issue of qualified immunity in this case, the result in *Robles* illustrates the odd result reached today by the majority.

In deciding this case as they do, my colleagues in the majority perhaps take comfort in the fact that the outcome of Deputy Purnell's mistake is rather extreme (although certainly much less extreme than the fatal mistake in *Milstead*) and that a jury *may* in any event ultimately find in his favor.[15] Nonetheless, I believe that law enforcement officers should pay close attention to how today's opinion appears to change the law in this circuit. Henceforth, law enforcement officers are on notice that apparently (1) this Court does not share the Supreme Court's view that arrests are presumptively dangerous; (2) this Court is prepared in a given case, including one involving hot pursuit, to substitute its judgment for the difficult and dangerous circumstances they face on the streets and to second-guess their actions literally on a second-by-second basis; and (3) when an officer has made an honest mistake in the otherwise proper execution of his duties, this Court is content to equate that mistake with intentional misconduct of the worst sort and to permit a jury to do the same. For these reasons, I believe that the decision today represents a significant departure from the precedent of this Court and the Supreme Court. Only time will tell whether this decision has the chilling effect that this Court, sitting *en banc*, warned about almost 20 years ago: that is, prompting law enforcement officers to choose inaction in order to avoid risking personal liability. *See Gooden*, 954 F.2d at 967.

Based on the foregoing, I respectfully dissent.

Judge Niemeyer and Judge Agee have authorized me to indicate that they join in this opinion.

---

[15]The majority correctly cites *Scott* for the proposition that once we view the facts in the light most favorable to Henry, the reasonableness of Deputy Purnell's conduct is a pure question of law. *See Majority Op.*, at 10-11. However, instead of applying this principle, the majority remands the issue for a jury to make that decision.

NIEMEYER, Circuit Judge, dissenting:

In its effort to deal with Officer Purnell's conceded mistake in shooting Henry while fleeing, the majority opinion blurs and applies, in a mix, three distinct standards of reasonableness — (1) the constitutional standard of reasonableness for measuring the use of deadly force; (2) the qualified immunity standard of reasonableness of an officer's awareness or understanding of clearly established law; and (3) the reasonable-man standard for the common law tort of negligence. And to confuse matters more, the majority declines to address, in its analysis, Officer Purnell's mistake because, it concludes, the mistake was limited to Officer Purnell's "subjective beliefs or intentions [which] have no place in our constitutional analysis." It thus disregards the substantial objective evidence of mistake, as well as the parties' stipulation that Officer Purnell made a mistake.

In addition, the majority fails to recognize, when rejecting Officer Purnell's qualified immunity, that no officer can have preexisting knowledge of a mistake before the mistake is made. The Supreme Court and our court have repeatedly acknowledged the fact that reasonable officers do, indeed, make mistakes in undertaking their duties, and when the mistake is an honest mistake, they are not held liable for violating the Fourth Amendment of the Constitution.

I am pleased to concur in Judge Shedd's fine opinion, and I write separately here only to address the majority's analysis, which, I respectfully submit, takes our qualified immunity jurisprudence far afield and hereafter will subject well-intentioned officers who make mistakes in the field to a level of liability that is unprecedented.

I

Officer Purnell, a 29-year veteran law enforcement officer, did, as the majority relates, attempt to serve Henry with an

outstanding warrant for his arrest, as it was the officer's duty to do. After Officer Purnell identified Henry, he told him he was under arrest and attempted to handcuff him. As Officer Purnell stated, "I had a hold, I don't [recall] if it was the right or left arm, but I was trying to get him handcuffed." At that point, Henry resisted and pushed Officer Purnell (a fact disputed by Henry) such that Officer Purnell "fell backwards" and caught himself on his car and his right leg. Officer Purnell testified that he considered Henry's action to be an assault on him. When Henry then ran, Officer Purnell pulled out what he thought was his Taser to stop Henry. When he fired it at Henry, however, Officer Purnell heard "a pop, and realized a mistake." Purnell stated that at that point "I immediately ran to him. I told him I was sorry I pulled the wrong weapon. I picked up my mic which was carried on my thing here and radioed Somerset Central, advised them that a man had been shot." Purnell then told the person that was with Henry to go to the house to get some ice and a wet rag to put on Henry's forehead, and Purnell himself administered first aid. Purnell then remained with Henry until medical assistance and other officers arrived.

Henry does not disagree with these facts, except as to his pushing Officer Purnell. Indeed, in the district court he stipulated to the fact that Officer Purnell had mistakenly used his handgun instead of his Taser.

This fact of honest mistake should require our finding, as Judge Shedd has ably set forth in his opinion, that Officer Purnell's seizure of Henry did not violate the Fourth Amendment. While Officer Purnell deliberately intended to use a Taser to stop Henry, his use of a handgun to shoot Henry was neither intended nor deliberate nor plainly incompetent, so as to constitute an unreasonable seizure under the Fourth Amendment.

## II

The majority opinion, applying three separate standards of reasonableness, conducts a syllogism basically to ignore the

fact of mistake. The opinion begins with the unremarkable observation that when a police officer shoots a fleeing suspect without probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others, the officer violates the suspect's Fourth Amendment rights, citing *Tennessee v. Garner*, 471 U.S. 1 (1985). Observing that "this case presents nothing to suggest Henry posed any threat whatsoever," the majority concludes that Officer Purnell's conduct in shooting Henry was therefore objectively unreasonable. *Ante*, at 11.

Turning to address the stipulated mistake, the majority states that "it is not the honesty of Purnell's intentions that determines the constitutionality of his conduct; rather it is the objective reasonableness of *his actions*." *Ante*, at 12 (emphasis added). Rather than addressing any mistake, the majority opinion then makes what I suggest is the first major wrong turn. It justifies its conclusion that Officer Purnell's seizure of Henry was constitutionally unreasonable by concluding that Officer Purnell's actions were not reasonable under a tort standard of negligence. It begins this negligence analysis, "There were several facts that Purnell knew or should have known that would have alerted any reasonable officer to the fact that he was holding his Glock." *Ante*, at 12. The opinion then devotes substantial attention to the facts of Officer Purnell's negligence. It lists at least four to justify its finding: (1) "Purnell knew he carried his Taser in the holster in his right thigh, which was about a foot lower than the holster on his hip that held his Glock." *Ante*, at 12. (2) "Purnell could feel the weight of the weapon he held in his hand, which, at about 38 ounces, was nearly twice the weight of his Taser." *Ante,* at 13. (3) "Purnell knew the Taser had a thumb safety that had to be flipped to arm the weapon. The Glock he was holding had no thumb safety." *Ante*, at 13. And, (4) "There was no evidence indicating that Purnell did not have the split-second he would have needed to at least glance at the weapon he was holding to verify that it was indeed his Taser and not the Glock." *Ante*, at 13-14.

After pointing out these facts, the majority opinion then concludes that Officer Purnell's actions were "not objectively reasonable." *Ante*, at 14. That conclusion would surely lead to the further conclusion that Officer Purnell was negligent because his actions were not those of a reasonable man. But this is not the conclusion that must be reached in order to decide whether Purnell should receive qualified immunity.

To determine whether Officer Purnell enjoyed qualified immunity, the dispositive inquiry would have to be whether a reasonable officer, in light of clearly established law, *could reasonably believe* that his actions were lawful. *Saucier v. Katz*, 533 U.S. 194, 206 (2001). "The general rule of qualified immunity is intended to provide government officials with the ability '*reasonably [to] anticipate* when their conduct may give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (emphasis added) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)). This reasonableness inquiry related to the determination of qualified immunity is designed to objectively consider *the knowledge* or *understanding* that an officer would have about the law applicable to his actions in the circumstances he faced.

In other words, the qualified immunity analysis is meant to determine whether a reasonable officer in the defendant's shoes should have known that his conduct was unlawful.

Under this standard, an officer who makes an honest mistake will always receive qualified immunity because he can never be on notice that his conduct is unlawful. Officer Purnell did not intend to use his gun as he set out to stop Henry with a Taser and mistakenly shot him with a gun. He could not have had prior knowledge and therefore understood that he was about to shoot Henry. In the language of the qualified immunity standard, he could not have "reasonably believed" or "reasonably anticipated" that his actions would violate clearly established law. The Supreme Court has acknowledged, "Federal officials will not be liable for mere mistakes

in judgment, whether the mistake is one of fact or one of law." *Butz v. Economou*, 438 U.S. 478, 507 (1978).

Moreover, the relevant conduct for purposes of determining qualified immunity would be the *mistake*, the act of Purnell's reaching for the Taser and in fact pulling his gun. And of course, it can readily be concluded that there is no clearly established law governing when such a mistake would be unreasonable under the Fourth Amendment.

The majority opinion, however, fails to address the qualified immunity standard. It completes its syllogism, after concluding that Officer Purnell's conduct was unreasonable in the tort sense, by (1) dismissing Officer Purnell's mistake as "good intentions," (2) concluding that Officer Purnell's "subjective intent or beliefs play no role" in the constitutional analysis, and (3) returning to its premise, stating what is undisputed but irrelevant, "under prong two [of the qualified immunity analysis], it would have been clear to a reasonable officer that shooting a fleeing, nonthreatening misdemeanant with a firearm was unlawful," a conclusion that never addresses the stipulated mistake.

In concluding that the mistake in this case could not be taken into account, because it was limited to Officer Purnell's subjective intent, the majority commits its final error. It fails to recognize the existence of the substantial objective evidence in the record, beyond Officer Purnell's subjective state of mind, which indisputably pointed to the fact of mistake. As witnessed by numerous persons at the scene, after Officer Purnell shot Henry, Purnell immediately ran to Henry and apologized to him in the presence of others, telling Henry that he did not intend to shoot him with the gun. Purnell then called for medical assistance; requested ice and a wet rag for Henry's forehead; administered first aid; and remained with Henry until assistance came. Were this not enough, Henry then stipulated in this case that Officer Purnell had indeed made a mistake.

Accordingly, in dismissing the mistake from the constitutional analysis because it was limited to Purnell's subjective intent, the majority had to overlook the substantial objective evidence and the parties' stipulation.

The fact of mistake in this case is, to be sure, an element that may render the traditional constitutional analysis for qualified immunity nonsensical because it is nonsensical to ask whether an officer reasonably believes that a mistake, about which he could have no advance knowledge, would violate clearly established law. Inherently, a mistake is not known or understood beforehand so as to enable an officer to have the understanding or belief about whether it would violate clearly established law.

Instead of grappling with the difficulty of fitting this core fact into the qualified immunity analysis, the majority simply deems the mistake to be irrelevant. And when the majority purports to apply the objective standard of constitutional reasonableness — a standard that measures a reasonable officer's *belief* or *understanding* about the lawfulness of his actions in given circumstances — it ignores the primary factor going into the officer's decisionmaking, the fact that he meant to shoot a Taser instead of a gun. Instead, it considers only the officer's ultimate act of shooting the gun and then concludes that Officer Purnell was unreasonable.

The majority's analysis also has the difficulty of now suggesting that an officer can violate the Fourth Amendment with merely negligent conduct.

We should be most reluctant to narrow the scope of qualified immunity as we do in this case. "[I]n determining what circumstances a court may consider in deciding claims of qualified immunity, we choose 'between the evils inevitable in any available alternative.' . . . The qualified immunity doctrine recognizes that officials can act without fear of harassing litigation only if they reasonably *can anticipate* when their

conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated." *Davis v. Scherer*, 468 U.S. 183, 195 (1984) (emphasis added) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 813-14 (1982)).

To be sure, this case presents a difficult analysis for the general qualified immunity jurisprudence. And its difficulty is reflected in the fact that the case has been before the Fourth Circuit three times, giving rise to divergent opinions among the judges of the court. But if this court is uncertain as to the state of the Fourth Amendment in cases involving mistake, surely no reasonable officer could have fully understood the limits of liability. *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (holding that an officer was not plainly incompetent and did not knowingly violate the law "not least because eight Court of Appeals judges agreed with his judgment in a case of first impression").

At bottom, I believe that this case undermines our qualified immunity jurisprudence and, unfortunately, subjects this officer to personal liability for making what was unquestionably an honest mistake in carrying out his official duties.

I would affirm for the reasons advanced by Judge Shedd.